# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

_____

VERONICA BUNCE,

                      Plaintiff,

      v.                              6:14-CV-761
                                          (GTS/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                      Defendant.

_____

PETER W. ANTONOWITZ, ESQ., for Plaintiff
KRISTINA D. COHN, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Glenn T. Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I. __PROCEDURAL HISTORY__

On November 29, 2007, plaintiff filed for Supplemental Security Income ("SSI"), alleging disability beginning November 25, 2007. (Administrative Transcript ("T.") 262-269, 275). The application was denied initially on March 5, 2008. (T. 122). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was conducted by ALJ Richard West on January 25, 2010. (T. 94-119). ALJ West issued an unfavorable decision on April 6, 2010. (T. 123-138). Plaintiff requested review by the Appeals Council, and on September 15, 2011, the Appeals Council remanded plaintiff's

case for supplemental proceedings[1]. (T. 139-42).

On June 5, 2012, ALJ F. Patrick Flanagan held a supplemental hearing at which plaintiff and Vocational Expert ("VE") Donald L. Schader appeared and testified. (T. 52-93). On June 15, 2012, ALJ Flanagan issued a decision finding that plaintiff was not disabled from the date of her application through the date of his decision. (T. 30-51). ALJ Flanagan's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on July 25, 2013.[2] (T. 6-10). Due to a delay in providing plaintiff with a copy of the denial, the Appeals Council granted plaintiff's request for an extension of time to commence this proceeding. (T. 1-5).

## II.   GENERALLY APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering

---

[1] Plaintiff filed a subsequent application for SSI benefits on March 9, 2011. In light of the remand, the Appeals Council directed the ALJ to associate the two applications and issue a new decision on the associated claims. (T. 141, 143-149).

[2] As this court is only reviewing the July 25, 2013 determination, all subsequent references to the "ALJ" refer solely to ALJ Flanagan.

his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012)); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *Selian*, 708 F.3d at 418 & n.2.

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision.  *Selian*, 708 F.3d at 417 (quoting *Talavera v. Astrue*, 697 F.3d at 151; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  It must be "more than a scintilla" of evidence scattered throughout the administrative record.  *Id.*  However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision.  *Id*.  *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record.  *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ

explicitly to reconcile every conflicting shred of medical testimony).  However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  FACTS

As of the date of the June 5, 2012 administrative hearing, plaintiff was 42 years old. (T. 56).  She graduated from high school, attending regular education classes, and obtained an Associates Degree from Mohawk Valley Community College. (T. 98, 400 636).  She was recently divorced, and has four children – three of whom still lived at home at the time of the hearing. (T. 57).

Plaintiff had a history of back pain, which her physicians attributed to obesity. (T. 64).  Prior to gastric bypass surgery in 2005, plaintiff weighed approximately 326 pounds, with a Body Mass Index[3] ("BMI") of 59.  (T. 33, 64, 573).    Plaintiff lost over 160 pounds after this surgery, and had a BMI of 29 in 2007.  (T. 33, 64).  At the time of the June 2012 hearing, plantiff's weight had increased to 200 pounds. (T. 33, 57). Plaintiff testified that the post-surgery weight loss did not significantly alleviate her back pain.  (T. 64).  Subsequent MRIs showed a small disc protrusion at the L5-S1 vertebra, and mild disc bulging at the L4-L5 level. (T. 33, 706).  Plaintiff declined epidural injections recommended by her physicians, fearing that they would be ineffective or mask the actual condition of her back, leading to further injury. (T. 71,

---

[3] BMI is a ratio of an individual's weight in kilograms to the square of his or her height in meters (kg/m 2).  A BMI over 30 is considered obese.  http://www.cdc.gov/ healthyweight/ assessing/bmi/adult_bmi/

716).

Plaintiff's most recent employment was as a shift supervisor at a fast food restaurant, a position she held for more than two years. (T. 636). This work involved eight hours standing or walking, resolving customer issues, cooking, counting money, supervising employees and coordinating supply deliveries. (T. 58-59). Plaintiff left this position in October 2007 after suffering panic attacks at work that required medical attention. (T. 61, 108). Plaintiff attributed these panic attacks to her back pain and to anxiety arising from work stress. (*Id.*). She had not sought employment since leaving that position. (T. 60).

Following the panic attacks in 2007, plaintiff received intermittent mental health treatment, including psychiatric medication. (T. 70, 725-32, 839-46). Plaintiff testified that she had missed several appointments due to her back pain. (T. 70). While the medical records indicate that plantiff showed improvement with psychiatric medication, plaintiff testified that she frequently became emotional or irritated, had crying spells at least once a day, and had anxiety or panic attacks two or more times per month. (T. 78). Her SSI application and hearing testimony also described feelings of exhaustion, headaches, memory problems, abdominal pain caused by nervousness, and difficulty sleeping. (T. 76-81, 297).

The ALJ's decision provides a detailed statement of the medical and other evidence of record. (T. 86-106). Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV.  ALJ's DECISION

The ALJ found that plaintiff had not been engaged in substantial gainful activity since the application date of November 29, 2007, based upon a consideration of plaintiff's testimony and wage information, together with the evidence as a whole. (T. 33).  Next, the ALJ determined that plaintiff's "depression, degenerative disc disease of the lumbar spine, and mild obesity status post gastric bypass surgery" were "severe" impairments. (T. 33).   The ALJ found that the evidence did not establish any functional restrictions secondary to plaintiff's other documented impairments including anxiety, vitamin B12 deficiency, anemia, headaches, asthma, and gastrointestinal issues.  (T. 33-34).  Thus, these impairments were not considered severe.  At the third step, the ALJ determined that plaintiff's impairments did not meet or medically equal the criteria of the relevant listed impairments in Appendix 1 to 20 C.F.R. Part 404, Subpart P.  (T. 34-37).

At step four of the sequential analysis, the ALJ found that plaintiff had the RFC to perform less than the full range of sedentary work.  (T. 37-38).  Specifically, the ALJ concluded that plaintiff could lift and/or carry ten pounds occasionally, sit for six hours in an eight-hour day, and stand and/or walk for two hours in an eight-hour day.  Plaintiff was deemed able to occasionally climb, balance, stoop, kneel, crouch and crawl.  The ALJ concluded that plaintiff should avoid exposure to extreme cold and heat, fumes, dust, and other respiratory irritants, and was limited to work involving simple and repetitive tasks. (*Id.*).  Plaintiff was considered able to communicate and cooperate with coworkers, accept instructions from supervisors, and was able to engage

in superficial, routine contact with customers. (T. 38). Plaintiff was unable to perform in a work setting where she would have to negotiate with or have more than occasional confrontation with others. (*Id.*).

The ALJ also found that, to the extent that plaintiff testified to greater restrictions than those identified in the RFC assessment, her testimony was not credible. (T. 38-40). The ALJ further concluded that plaintiff did not retain the capacity to perform her past relevant work as a fast food manager, which was categorized as light work. (T. 43). However, "considering the [plaintiff']'s age, education, work experience, and residual functional capacity," there were jobs that existed in significant numbers in the national economy that plaintiff could perform. (*Id.*). Relying on the VE testimony, the ALJ found that plaintiff would be able to perform jobs such as non-emergency dispatcher and appointment clerk, both of which are classified as sedentary jobs. (T. 44). Accordingly, the ALJ determined that plaintiff was not disabled from the application date of November 29, 2007 through the date of the decision. (*Id.*).

## V.    ISSUES IN CONTENTION

Plaintiff  makes the following arguments:

(1)    The ALJ failed to properly assess plaintiff's credibility. (Pl's Br. at 13-14). (Dkt. No. 16).

(2)    The ALJ's residual functional capacity ("RFC") determination is not supported by substantial evidence because he improperly weighed the medical evidence and failed to include the true limiting effect of plaintiff's impairments. (Pl.'s Br. at 14-21).

Defendant argues that the Commissioner's decision is supported by substantial

evidence and that the additional evidence submitted to the Appeals Council did not provide a basis for altering the ALJ's decision. (Def.'s Br. at 2-13) (Dkt. No. 17). As discussed below, this court agrees with defendant and recommends dismissal of the complaint.

## DISCUSSION

### VI. CREDIBILITY

#### A. Legal Standard

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. § 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to function.

9

20 C.F.R. § 416.929(c). When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. § 416.929(c)(3).

## B. Application

The ALJ found that plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . . . claimant has failed to produce appropriate, probative evidence as required by the Social Security Act, Regulations and Rulings to substantiate her subjective allegations of disabling symptoms. In the absence of such substantiating evidence, controlling weight cannot be given to subjective complaints, no matter how intensely expressed (SSRs 96-3 and 96-4p)." (T. 38). Plaintiff argues that the ALJ's credibility determination was not supported by substantial evidence because her testimony regarding her symptoms and limitations was verified by her treating sources and a consultative physician. (Pl.'s Br. at 14-15). This court disagrees, as the ALJ primarily based his credibility determination on the documented inconsistencies between plaintiff's testimony and the

10

medical evidence.

During the hearing before the ALJ, plaintiff testified that she had difficulty controlling her emotions at times, had difficulty sleeping, suffered a history of back pain that made movement difficult, and recently developed hand tremors. (T 67-81). Plaintiff believed that many of her physical impairments stemmed from her depression and anxiety. (T. 66). The ALJ asked numerous questions regarding plaintiff's emotional and physical condition, her work experience, and her ability to handle work-related situations. (T. 65-66). He also elicited testimony regarding plaintiff's activities of daily living, including housekeeping, taking care of her children, and socializing with family. (T. 73-78).

In his determination, the ALJ took plaintiff's testimony into account when evaluating her claims that she was unable to work due to anxiety, depression, anemia, back pain, lumbar spondylosis, lumbar radiculopathy, degenerative disc disease, nerve damage, arthritis in her back, vitamin deficiency, plantar fascitis, osteoarthritis, acid reflux, hiatal hernia, and gastric bypass. (T. 35-38, 297). He also reviewed plaintiff's claims that she could not "handle being around other people," had memory problems, and was in constant pain. (T. 38, 297).

In support of his determination regarding plaintiff's credibility, the ALJ appropriately considered the record evidence in accordance with 20 C.F.R. § 416.929, and found no objective medical evidence to support plaintiff's description of her functional limitations. (T. 38-39). For example, the ALJ specifically noted that plaintiff's allegations of the extent of her physical impairments were not supported by

the physicians' notes on the diagnostic imaging reports in the record. (T. 38). Dr. Mohammad Omar noted on plaintiff's April 9, 2008 MRI report that there was a small central disc protrusion at the L5-S1 level that did not impinge on exiting nerve roots[4] , "mild" bulging of the disc at the L4-5 level, and "mild" degenerative change in the lumbar region. (T. 39, 706). Overall, Dr. Omar found "the alignment of the lumbar spine to be satisfactory. The disc spaces are well-maintained." (T. 706). Dr. Omar reviewed a follow-up MRI on February 9, 2011 MRI and concluded that there was "no interval change of significance" from 2008. (T. 787). Dr. Omar found that both the L4-5 and L5-S1 vertebra appeared stable, with a moderate degree of degenerative change in the facet joints. (T. 39, 787).

Similarly, an electromyography test ("EMG") was performed on January 31, 2012 to assess nerve damage after plaintiff complained that her lower back pain was radiating to her legs, causing numbness and weakness. (T. 808). Dr. Arun Dinghra issued an EMG and Electrodiagnostic Study Report ("EMG Report") on January 21, 2012, and found that plaintiff had "moderate" sensory polyneuropathy in the lower extremities but "no definite electrodiagnostic evidence suggestive of lumbar sacral radiculopathy. . . ."[5] (T. 41, 809).

---

[4] Nerves that exit the cervical spine travel down through the arms, hands, fingers, legs and feet. Impingement of an exiting nerve can cause pain that radiates through these appendages. http://www.spine-health.com/conditions/spine-anatomy/radiculopathy-radiculitis-and-radicular-pain

[5] Polyneuropathy is damage or irritation to multiple nerves. http://www.ninds.nih.gov/disorders/peripheralneuropathy/detail_peripheralneuropathy.htm. Lumbar radiculopathy is nerve irritation caused by damage to discs between the vertebrae. http://www.medicinenet.com/script/main/art.asp?articlekey 26093

The ALJ found the same lack of support for plaintiff's testimony regarding her physical impairments upon review of the treatment notes of her treating sources and consultative examiners. (T. 39). During a December 11, 2007 evaluation by Susan Grove, a Nurse Practitioner, plaintiff was "very tender" at the lumbar spine area, but was able to touch her toes without any difficulty and had normal range of motion in her upper and lower extremities. (T. 39, 598). The ALJ also considered N.P. Grove's summary of a February 2007 MRI which showed "early arthropathy at the L5-S1 area" but no other abnormalities. (T. 39, 687). Upon referral by N.P. Grove, Dr. Mitchell Rubinovich diagnosed plaintiff with "mechanical low back pain" in February 19, 2008, but found a normal gait pattern and straight leg raise of 90 degrees; Dr. Rubinovich concluded that plaintiff was "otherwise relatively healthy." (T. 704). Dr. Rubinovich ordered the April 2008 MRI, and referred plaintiff to physical therapy; but there are no records of any further visits by plaintiff. (T. 62, 702-04). Plaintiff testified that she did not see Dr. Rubinovich for follow-up after the MRI was performed. (T. 62).

The ALJ next considered the treatment notes of Dr. Reo Peniston, plaintiff's treating physician from September 2009 to December 2011, who found tenderness of the lumbar spine during his regular physical examinations of plaintiff, but noted no other abnormalities. (T. 40-41, 760-62, 764, 772-74). Dr. Peniston's notes also reflect that plaintiff began seeing him in late 2009 after declining a pain management specialist's recommendation of epidural injections to treat her back pain. (T. 736). Dr. Peniston primarily treated plaintiff with prescription pain medication. (T. 772-74).

In assessing plaintiff's credibility, the ALJ also reviewed Dr. Justine Magurno's January 30, 2008 consultative exam findings. Dr. Magurno found that plaintiff had a normal gait, could walk on heels and toes without difficulty, could perform a full squat while holding on for support, and needed no help changing for the exam or getting on and off the examination table. (T. 641). Plaintiff did not require a cane or other assistive device during the exam, but did have to push in order to rise up from a chair. (T. 641).

The ALJ found similar results from the March 17, 2010 consultative exam report issued by Dr. Roberto Rivera. Dr Rivera found that plaintiff had a normal gait and was able to walk on her heels and toes, although she did so with some difficulty and back pain. (T. 748). Plaintiff did not require any assistance changing for the exam, getting on and off the examination table, or rising from a chair. (*Id.*). Dr. Rivera concluded that plaintiff had limited range of motion in her lumbar spine, but full range of motion in her cervical spine, shoulders, elbows, forearms, wrists, hips, knees and ankles. (T. 39, 748-49).

The ALJ performed a similar analysis regarding plaintiff's mental impairments, and concluded that plaintiff's claims regarding the functional limitations imposed by her mental impairments were not credible. (T. 39-40). The ALJ noted that plaintiff's GAF[6] scores ranged from 50 to 70, which suggested only mild to moderate limitations.

---

[6] The GAF Scale (DSM IV Axis V) ranks psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness to assist "in tracking the clinical progress of individuals [with psychological problems] in global terms." *Kohler v. Astrue,* 546 F.3d 260, 262 n. 1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders ("DSM IV"),* at 32 (4th ed. 2000)). GAF is a 100 point scale, and

(T. 39, 647, 731). She had never been hospitalized for psychiatric issues, and had received intermittent outpatient psychiatric treatment, with gaps of a year or more. (T. 33, 40, 636). Numerous mental health evaluations described plaintiff as "friendly", "polite", and "cooperative." (T. 39-40, 638, 849, 851). Plaintiff exhibited signs of depression but also stated that her symptoms were improving. (T. 638, 646, 851, 853). The ALJ noted that in the most recent psychiatric evaluations, plaintiff was in "good spirits" and reported that her medications seemed to be working, that she was motivated to try to recover, and that "she feels she knows that she can improve her outlook." (T. 850-51). The ALJ found no record of plaintiff having any problems with social functioning, except for difficulties with her ex-husband, who was physically and verbally abusive.[7] (T. 40, 646, 732).

As part of his evaluation, the ALJ also considered plaintiff's testimony and other statements regarding her activities of daily living. (T. 35). Plaintiff described socializing with friends and family, regularly attending church, grocery shopping, and taking her daughters to Girl Scouts and other activities. (T. 65, 75-76, 78, 840). Plaintiff reported that she was able to care for her personal needs and help her younger children get ready for school without assistance, as well as perform household chores such as cooking, cleaning and laundry with help from her family. (T. 638). The ALJ concluded that plaintiff had mild restrictions in activities of daily living, and moderate

41-50 indicates "serious symptoms," 51-60 indicates "moderate symptoms," and 61-70 indicates "some mild symptoms." DSM-IV-TR at 32-34.

[7] Plaintiff testified at the June 5, 2012 hearing that she was recently divorced.

15

difficulties with social functioning and concentration, persistence, and pace. (T. 35).

The ALJ did not dispute the existence of plaintiff's physical or mental impairments, but concluded that plaintiff's description of the functional limitations caused by those impairments was inconsistent with the record evidence. (T. 38-39). The ALJ has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant. *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir.1979). If the findings "are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Aponte v. Secretary, Dep't of Health & Human Services*, 728 F.2d 588, 591 (2d Cir.1984). In light of the inconsistency between plaintiff's description of her symptoms and the record evidence evaluated and cited by the ALJ, the ALJ's credibility determination was supported by substantial evidence.

## VII.   <u>TREATING PHYSICIAN/RFC</u>

### A.   Legal Standards

#### 1.   Treating Physician

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is *not* required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32

(2d Cir. 2004). The ALJ must properly analyze the reasons that the report of a treating physician is rejected. *Id.* An ALJ may not arbitrarily substitute his/her own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

Notwithstanding the "treating physician rule," it is the province of the ALJ to consider and resolve conflicts in the evidence as long as the decision rests upon "adequate findings supported by evidence having rational probative force." *Galiotti v. Astrue*, 266 F. App'x 66, 67 (2d Cir. 2008) (citing *Veino*, 312 F.3d at 586). A conclusory statement of disability is not binding on the ALJ if that opinion is inconsistent with substantial evidence in the record. *Michels v. Astrue*, 297 F. App'x 74, 76 (2d Cir. 2008) (citing *inter alia Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *Veino*, 312 F.3d at 588. *See* 20 C.F.R. § 404.1527(e)(1) (a statement by a medical source that a claimant is "disabled" does not mean that the Commissioner will make that determination). The term "disabled" is a legal not a medical definition. *Id.*

## 2. RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical

facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

## B. Application

The ALJ found that plaintiff could perform less than the full range of sedentary work. (T. 43-44). Plaintiff argues that, in making this finding, the ALJ failed to give proper weight to the RFC evaluations of her treating sources, particularly Dr. Peniston, and failed to properly weigh the other medical evidence. Plaintiff also contends that the ALJ's erroneously determined that certain skills that plaintiff developed as a fast food manager were transferable to other work. This court does not agree with plaintiff's contentions and concludes that the ALJ's RFC assessment was supported by substantial evidence.

18

### 1.    Treating Physician

Plaintiff relies upon Dr. Peniston's checking the boxes on a December 2011 Medical Source Statement to indicate that plaintiff's "[p]ain is present and found to be incapacitating to this patient causing this individual to be off-task for at least 50% of the time in an 8-hour workday" and that plaintiff's chronic back pain, dizziness, and hand tremors were likely to produce "good days" and "bad days." (T. 805).  Dr. Peniston also opined that plaintiff's impairments were likely to cause her to be absent from work more than four days per month.  (*Id.*).   Plaintiff contends that this Medical Source Statement by a treating physician must be afforded great weight, and adequately demonstrated that plaintiff was unable to perform any sedentary work.  (Pl.'s Br. at 19-20).

However, ALJ Flanagan's determination shows that he considered Dr. Peniston's Medical Source Statement, but gave it little weight in light of the doctor's own notes compiled over the more than two year treatment relationship with plaintiff. (T. 40-41).  These notes reflect Dr. Peniston's regular treatment of plaintiff for back and other pain, dizziness, and depression, but do not include any findings that approach the functional limitations described in the doctor's Medical Source Statement. (T. 736, 760, 762, 764, 777).  On September 9, 2009, plaintiff began receiving treatment from Dr. Peniston.  (T. 779).  Plaintiff stated that she had recently stopped seeing a pain management specialist after rejecting the doctor's recommendation that plaintiff have epidural injections.  (*Id.*).  Dr. Peniston prescribed pain medication and recommended that plaintiff reconsider the epidural injections. (*Id.*).

On January 7, 2010, plaintiff had a follow-up with Dr. Peniston, and reported no tenderness in the lumbrosacral spine, but did complain of hip pain, which was evaluated by x-ray. (T. 777). On March 4, 2010, plaintiff reported that the medication was helping her neuropathy and chronic back pain. (T. 775). On September 9, 2010, Dr. Peniston found "moderate midline tenderness to palpation of the lumbar vertebrae," and plaintiff reported that her back pain was consistent, but not responding to medication. (T. 774). Dr. Peniston adjusted plaintiff's medication. (T. 774). On October 11, 2010, plaintiff reported that the prescription pain medication was helping, but an examination showed continued tenderness in the lumbrosacral spine. (T. 773). On January 10, 2011, Dr. Peniston found "moderate midline tenderness to palpation of the lumbar vertebrae, and a positive straight leg raise. (T. 772). Plaintiff was referred for an MRI and prescribed pain medication. (T. 772).

From August 2011 to January 2012, Dr. Peniston evaluated plantiff's complaints of dizziness and fatigue, but did not identify a specific cause.[8] (T. 761-67). On January 24, 2012, Dr. Peniston reviewed an x-ray of plaintiff's spine and found some degenerative changes but "no compression deformity with no spondylolisthesis or spondylolysis." (T. 761). Plaintiff's upper and lower extremities were normal, and plaintiff was advised to take anti-inflammatories as needed. (T. 762). On March 23, 2012, Dr. Peniston examined plaintiff and found no abnormalities in her upper and lower extremities, and did not reference back pain in his notes. (T. 760).

Dr. Peniston's treatment records are more consistent with a March 4, 2011

---

[8] Plaintiff testified that her dizziness was significantly alleviated by medication. (T. 67).

evaluation that the doctor completed for Oneida County Social Services, in which he described plaintiff as having moderate limitations in walking, standing, sitting, lifting, pushing/pulling/bending, and climbing, and found no evidence of limitations in mental functioning. (T. 755). Dr. Peniston found that plaintiff should avoid heavy lifting, and prolonged standing, walking, and sitting.[9] Plaintiff has not identified anything in the record to indicate a significant change in plaintiff's condition from March 2011 to December 2011, when Dr. Peniston completed the Medical Source Statement.

Because Dr. Peniston's December 2011 Medical Source Statement conflicted with the doctor's own treatment notes and an earlier RFC evaluation, the ALJ was not required to afford Dr. Peniston's opinion controlling weight. *See Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013). The ALJ provided an adequate explanation of these inconsistencies and documented the much less restrictive findings in Dr. Peniston's treatment notes. Therefore his determination is supported by substantial evidence.

The ALJ undertook a similar analysis for the other medical opinions in the record. For example, Dr. Sajid Kahn, one of plaintiff's treating physicians, completed a March 18, 2009 Physical RFC Assessment, checking the boxes to indicate that plaintiff was only able to occasionally lift five pounds or less, could stand or walk for less than two hours during an eight hour workday, and could only sit for less than four hours

---

[9] Dr. Peniston's March 2011 evaluation form specifies plaintiff's ability to perform particular physical and mental functions, unlike the medical source statement prepared in December 2011, which provides general conclusions about the extent to which plaintiff will be "off-task" or absent from work as a result of symptoms or impairments. (T. 755, 805).

during the same period. (T. 724). The ALJ detailed the significant differences between Dr. Kahn's RFC Assessment and his treatment notes. (T. 40). During a July 7, 2008 appointment, plaintiff reported being able to independently perform activities of daily living, comfortably lift 15 pounds, pick up objects from the floor comfortably, but was only being able to comfortably sit for 15 minutes or stand for five minutes. (T. 721). Dr. Kahn found mild tenderness of the lumbar paraspinal muscles, with a negative straight leg raise and slightly limited range of motion. (T. 722). On August 8, 2008, Dr. Kahn described plaintiff as sitting in a chair with no acute distress, with mild tenderness of the lumbar paraspinal muscles and a slightly limited range of motion. (T. 719). Plaintiff had a normal gait, and had a negative straight leg raise. (*Id*.) During a March 18, 2009 office visit, (the same day that he completed the restrictive RFC Assessment), Dr. Kahn found moderate tenderness of the lumbar paraspinal muscles, a negative straight leg raise, and slight limitations on plaintiff's range of motion. (T. 716). The ALJ also noted that plaintiff had refused Dr. Khan's recommended treatment of lumbar epidural steroid injections on multiple occasions. (T. 40, 716, 722-23).

Similarly, the ALJ gave little weight to the November 15, 2011 opinion of Dr. Arun Dhingra that plaintiff would be off task at least 25% of the time in an eight hour workday. (T. 804). The ALJ noted that the Dr. Dinghra based his opinion on plaintiff's diagnosed hand tremors, without elaboration. (T. 41). This conclusion was inconsistent with Dr. Dinghra's limited treatment notes. On August 5, 2011, Dr. Dinghra reviewed plaintiff's EMG test results and found moderate polyneuropathy that could not be definitively connected to plaintiff's back pain. (T. 41, 809). Dr. Dinghra suspected that

plaintiff had benign essential tremors and tension headaches, with plaintiff's excessive caffeine intake a contributing factor. (T. 807).

The ALJ found similar inconsistencies in the proffered opinions of plaintiff's mental health treating sources, and therefore gave the opinions of Dr. Bahram Omidian, Nurse Practitioner Linda Talerico and Therapist Molly McFadden little weight. (T. 36-37, 42). For example, Dr. Omidian submitted a March 2009 Affective Disorder Questionnaire ("Questionnaire") stating that plaintiff had marked restrictions in daily activities; marked difficulties in maintaining social functioning; general difficulties with concentration, persistence or pace; and repeated episodes of deterioration or decompensation in work or work-like situations. (T. 713). One month earlier, Dr. Omidian had assigned plaintiff a GAF score of 55-60, indicative of moderate symptoms, even after plaintiff had missed several appointments and had stopped taking her medication. (T. 731). On March 4, 2009, Dr. Omidian described plaintiff as "alert and oriented," "cooperative and friendly," and interested in re-starting her medication. (T. 730). On April 1, 2009, Dr. Omidian described plaintiff as "friendly and pleasant," and noted that she had recently celebrated a birthday with friends, but that she still felt depressed and anxious. (T. 729). Dr. Omidian's treatment notes do not reflect the marked difficulties in daily activities, social functioning, or concentration described in his Questionnaire. Instead, they indicate that Dr. Omidian saw plaintiff on an intermittent basis, and that plaintiff's condition generally improved with medication. (T. 728-30).

Likewise, the October 31, 2011 Questionnaire completed by Talerico and

McFadden found marked restrictions of daily activities; marked difficulties in social functioning; and difficulties in concentration, persistence or pace. (T. 858). In February 2011, McFadden noted that plaintiff showed relaxed behavior, mood and affect within normal limits, an absence of delusions or aggressive thoughts, and average intelligence. (T. 839-46). In September 2011, plaintiff informed Talerico that she had occasional anxiety, but that her medication was working. (T. 851). Talerico described plaintiff as alert, in good spirits, cooperative and well-mannered, with a generally upbeat attitude and good impulse control. (*Id.*). There are no notes or clinical findings which support the marked limitations set forth in the Talerico/McFadden Questionnaire.

The ALJ noted that the "Affective Disorders Questionnaires" completed by Dr. Omidian, Talerico and McFadden did not offer the option of selecting "mild" or "moderate" limitations, and "appeared designed to elicit specific responses," namely, marked limitations. (T. 42, 713, 858). Plaintiff has not offered an alternative explanation for the inconsistencies found by the ALJ between the boxes these medical providers checked on the Questionnaires, which indicated that plaintiff had marked limitations, and the treatment notes, which suggested less serious functional limitations.

The ALJ handled the consultative examiner reports with the same scrutiny as those by the treating physicians. (T. 41-42). He assigned Dr. Magurno's January 30, 2008 opinion, particularly that plantiff had marked limitations for sitting and standing, little weight due to its inconsistencies with Dr. Magurno's examination summary and the available MRI reports. (T. 41). For example, Dr. Magurno found that plaintiff had a normal gait, could walk on heels and toes without difficulty, used no assistive devices,

and could squat and rise from a chair with moderate effort. (T. 641). This conflicted with Dr. Magurno's ultimate conclusion that plaintiff had marked limitations for sitting and standing, and moderate limitations for walking. (T. 643). The ALJ did find record support for Dr. Magurno's conclusion that plaintiff should avoid smoke, dust and other respiratory irritants, and incorporated this finding into plaintiff's RFC. (T. 44).

In contrast, the ALJ assigned consultative examiner Dr. Rivera's March 17, 2010 opinion great weight because it was supported by Dr. Rivera's examination findings and was more consistent with the clinical findings in plaintiff's treatment notes, as well as the available MRIs. (T. 41). Dr. Rivera considered plaintiff's statements during the consultative exam that she cooked twice a week, shopped once a month, and performed chores with assistance from her family. (T. 747). Plaintiff had a normal gait, could walk on heels and toes with difficulty, showed no spinal tenderness, and had full range of motion in her upper and lower extremities. (T. 748-49). Dr. Rivera found limited range of motion in plaintiff's lumbar spine. (T. 748). Dr. Rivera ultimately found that plaintiff had no limitations on sitting or standing, moderate limitations on walking, and mild to moderate limitations for lifting, carrying, pushing and pulling. (T. 749).

Plaintiff also assigned great weight to consultative psychological examiner Dr. Dennis Noia, as it was consistent with his examination of plaintiff and with the GAF scores in the record. (T. 42). Dr. Noia found that plaintiff was cooperative and responsive, and that she demonstrated an adequate manner of relating and social skills. (T. 638). Plaintiff showed cohesive thought processes, intact attention and concentration, and "fair to good" insight and judgment. (*Id.*). Dr. Noia noted that

plaintiff had a depressed mood and appeared sad, and that she showed mild memory impairment. (*Id.*). Based upon his examination, Dr. Noia opined that plaintiff was able to understand and follow simple instructions and directions, perform simple and direct tasks with supervision and independently, learn new tasks, make appropriate decisions, and relate to and interact with others, but that plaintiff had some difficulty dealing with stress. (T. 639).

Dr. Noia's findings were consistent with those of Dr. Richard Altmansberger, the State Agency psychological consultant who reviewed plaintiff's medical records in March 2008. (T. 42-43, 665-67). The ALJ gave this opinion some weight, but discounted it to reflect that Dr. Altmansberger had not examined the plaintiff. (T. 43).

As stated above, it is the province of the ALJ to resolve conflicts in the evidence. *Galiotti v. Astrue*, 266 F. App'x at 67. The ALJ did this by summarizing the numerous medical opinions in the record and providing his reasons for assigning evidentiary weight to each. (T. 40-43). The report of a consultative examiner may serve as substantial evidence upon which the ALJ may base his decision, and thus the ALJ's reliance upon the opinions of Dr. Rivera and Dr. Noia was appropriate. *Herb v. Colvin*, No. 14-CV-156, 2015 WL 2194513, at *5 (W.D.N.Y. May 6, 2015) (citing *Finney ex rel. B.R. v. Colvin*, No. 13-CV–543A, 2014 WL 3866452, at *7 (W.D.N.Y. Aug. 6, 2014) (Rep't-Rec.)); *Simmons v. Comm'r of Soc. Sec.*, No. 13-CV-5504, 2015 WL 2182977, at *16 (S.D.N.Y. May 8, 2015) (citing *Mongeur*, 722 F.2d at 1039). Therefore, the ALJ's consideration of the treating and consultative medical opinions is supported by substantial evidence.

## 2.    RFC Analysis/Transferability of Skills

Plaintiff also argues that the ALJ improperly concluded that certain of plaintiff's skills, developed while a shift supervisor at a fast food restaurant, were transferable to other positions. (Pl.'s Br. at 16-18). Specifically, the ALJ relied upon the VE testimony to find that plaintiff's managerial work experience had developed "the skills necessary to identify ways to help people and coordinate activities," and that these skills were transferable to other work. (T. 44). The VE discussed two such positions at the hearing: non-emergency dispatcher and appointment clerk. (T. 83-87).

The customer service or "people skills" described by the ALJ qualify under the Social Security Regulations as transferable skills when developed through supervisory work experience. *Hulbert v. Comm. of Soc. Sec.*, No. 6:06-CV-1099 (LEK/GJD), 2009 WL 2823739 at *21 (N.D.N.Y. Aug. 31, 2009) (collecting cases). Plaintiff testified to possessing these skills, by describing her shift supervisor duties as including ". . . making sure that all the other employees were doing their jobs, and taking care of any customers that were disgruntled or making sure that everything was safe and clean and ran the way it was supposed to be run . . . ." (T. 59). Plaintiff testified that dealing with disgruntled customers was a significant source of stress at this job. (T. 65-66). Plaintiff gave differing accounts of her reasons for leaving this position, testifying in January 2010 that her back pain led to panic attacks, and testifying in June 2012 that work stress was the primary cause. (T. 64, 108).

The record as developed by the ALJ supports the hypothetical offered to the VE of an individual ". . . capable of performing sedentary work . . . with the additional

physical limitations that the individual can only climb, balance, stoop, kneel, crouch and crawl occasionally, and from a mental health standpoint is limited to simple repetitive tasks. The individual can communicate and cooperate with coworkers, accept instructions from supervisors and . . . greet and engage in superficial contact or communication with customers, but who cannot perform in a setting where she must negotiate with others or in a setting involving more than occasional confrontation with others." (T. 84-85). This hypothetical reflects the limitations expressed in the medical opinions that were given the greatest weight, as well as plaintiff's testimony about her work experience and sources of work-related stress. (T. 43, 59, 65-66). It is also consistent with the RFC assessment set forth in the ALJ's determination. (T. 37-38). Aside from the medical opinions that were appropriately discounted by the ALJ, plaintiff offers no support for the contention that her "problems with memory; difficulty relating with people and difficulty in dealing with stress result in her present inability to apply the skills she used in her prior occupations . . . ." (Pl.'s Br. at 18). As the ALJ's weighing of the medical evidence has already been found to be valid, it follows that plaintiff's argument must be rejected, and that substantial evidence supported the ALJ's determination that certain of plaintiff's work skills were transferable.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the decision of the Commissioner be affirmed, and the plaintiff's complaint be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk

of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: July 23, 2015

Hon. Andrew T. Baxter
U.S. Magistrate Judge